UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RENUKA MISRA,<br><br>    Plaintiff,<br><br>    vs.<br><br>XECHEM INTERNATIONAL INC.,<br><br>    Defendant. | Civil Action No. 08-CV-03231<br><br>Honorable James B. Moran |

# REPLY OF XECHEM INTERNATIONAL, INC. TO PLAINTIFF RENUKA MISRA'S OPPOSITION TO DEFENDANT XECHEM INTERNATIONAL, INC.'S MOTION TO VACATE DEFAULT JUDGMENT

Kenneth A. Henry
Attorney for Defendant
One North LaSalle Street, #2200
Chicago, IL 60602-3912
Tel. (312) 857-0100
Fax: (312) 857-1157
khenry@kahlaw.com
(ARDC #1193457)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

SUMMARY OF ISSUES REPLIED TO.................................................................................. 1

THE FACTUAL RECORD DOES NOT SUPPORT MARYLAND LONG ARM
JURISDICTION................................................................................................................... 2

THE NOTES SUED ON WERE MADE IN NEW JERSEY ..................................................... 4

A VOID JUDGMENT MUST BE VACATED BY THIS COURT WHEN IT IS
DETERMINED THAT THE ISSUING COURT DID NOT HAVE JURISDICTION .............. 4

THIS COURT HAS NO DISCRETION. TO DO DUE PROCESS, THE SUPREME
COURT HAS REQUIRED THAT IT RULE ON THE 60(b)(4) MOTION
PRESENTED HERE ........................................................................................................... 5

THE FAILED SERVICE OF A SUMMONS WAS A JURISDICTIONAL DEFECT,
THE SAME AS THE LACK OF LONG ARM JURISDICTION............................................ 8

MS. MISRA'S ESTOPPEL ARGUMENT IS INVERTED. SHE IS ESTOPPED, NOT
XECHEM INTERNATIONAL .............................................................................................. 9

MERITORIOUS DEFENSE IS NOT REQUIRED UNDER FRCP 60(b)(4) .......................... 11

CONCLUSION.................................................................................................................... 12

APPENDIX TO REPLY BRIEF

AFFIDAVIT OF STEPHEN BURG WITH ATTACHMENTS

# TABLE OF AUTHORITIES

## Cases

*Adam v. Saenger*, 303 US 59 (1938) ............................................................................. 5

*Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (CA 5 1988) ......... 13

*Board of Trustees Sheet Metal Workers v. Elite Erectors, Inc.*, 212 F.3d 1031 (7th Cir. 2000) ................................................................................................................... 4

*Carimi v. Royal Caribbean Cruise Line*, 959 F.2d 1344, 1345 (CA 5 1992) .............................. 13

*Cent. Vermont Pub. Serv. Corp. v. Herbert*, 341 F.3d 186 (2nd Cir. 2003) .................................. 5

*Harper McLeod, Solicitors v. Keaty and Keaty*, 260 F.3d 389, 394-95 (Fifth Cir. 2001) ............. 5

*Insurance Corp. v. Compagnie des Bauxites*, 456 U.S. 694 (1982), *Stol v. Gottlieb*, 305 U.S. 165 (1938) .................................................................................................... 14

*Kalb v. Feuerstein*, 308 U.S. 433, 438 (1940) ............................................................... 12

*Kulko v. Superior Court of California*, 436 U.S. 84 ....................................................... 14

*Marques v. Federal Reserve Bank*, 286 F.3d 1014, 1017-18 (CA7 2002) .................................. 13

*Merrill Lynch Mortgage vs. Narayan*, 908 F.2d 246, 252 (CA 7 1990) .................................... 11

*Packard Press Corp. v. Com Bu Corp.*, 584 F.Supp. 73 (ED Pa 1984) ....................................... 8

*Peralta v. Heights Medical Center*, 485 U.S. 80, 84 ....................................................... 13

*Practical Concepts v. The Republic of Bolivia*, 613 F.Supp. 863 (USDC DC 1985) .................... 7

*Printed Media Services, Inc. v. Solna Web, Inc.*, 11 F.3d 838 (CA8 (Minn.) ................................ 9

*Thompson v. Whitman*, (18 Wall.) 85 U.S. 457, 21 L. ed. 897 (1873) ................................. 5, 6, 14

*Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899 (7th Cir. 2004) ..................................... 3

## Statutes

28 U.S.C. 1963 ..................................................................................................... 6, 15

## Other Authorities

*Black's Law Dictionary*, 4th Edition ............................................................................ 4

*Federal Practice and Procedure*, Wright and Miller, Section 2865 ............................................. 4

U.S. Constitution, Annotated, Article 3 ....................................................................... 14

U.S. Constitution, Annotated, Article 4 Sec. 1 ............................................................... 6

**Rules**

FRCP Rule 55(c).................................................................................................... 11

FRCP Rule 60(b)............................................................................................. 4, 11, 13

FRCP Rule 60(b)(4) ........................................................................................... passim

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

RENUKA MISRA,

     Plaintiff,

     vs.

XECHEM INTERNATIONAL INC.,

     Defendant.

Civil Action No. 08-CV-03231

Honorable James B. Moran

### REPLY OF XECHEM INTERNATIONAL, INC.
### TO PLAINTIFF RENUKA MISRA'S OPPOSITION TO DEFENDANT XECHEM
### INTERNATIONAL, INC.'S MOTION TO VACATE DEFAULT JUDGMENT

This is a reply memorandum. We shall endeavor to limit this reply to those matters raised by the Plaintiff in its Opposition without restating those matters adequately covered in our earlier filing.[1]

## SUMMARY OF ISSUES REPLIED TO

Ms. Misra fails to identify the issue of want of jurisdiction of the Maryland court raised by Xechem's filing.

At pages 2 and 12 of Xechem International's Memorandum charging that the Maryland District Court lacked jurisdiction Ms. Misra, in her 24 page brief in opposition, seeks to induce the Court to believe that the sole issue is whether or not there was good service of Summons on Leonard Mudry, a former officer of Xechem International, Inc., but not an officer or an employee at the time of her service.

It is as though Mr. Mudry had gone to work for the air conditioning company and was at the premises of Xechem International in New Jersey, working on Xechem International's air conditioning unit and by happenstance was served by process server.

Basic, however, is the undenied articulation of the total lack of jurisdiction over Xechem International, Inc., the Delaware corporation, none of the ten elements enumerated at page 2 in the

---

[1]    We have attached to this Reply the second Affidavit of Stephen Burg, one of the longest serving directors of Xechem International, Inc. and Xechem, Inc., an Illinois corporation.

His articulation of facts set forth in his Affidavit are incorporated in this Reply by reference, without reiteration.

We attach for the Court's convenience an Appendix of relevant documents.

Statement of Facts in our original Motion is effectively disputed by Ms. Misra or *bona fidely* contradicted by the Affidavit of any filer in the 2 and ½ inch bundle of affidavits filed by her, and especially the Affidavit of Ramesh Pandey.

The Affidavits of Stephen Burg, which by reference are incorporated *haec verba* in this Reply, establishes that the so-called jurisdictional acts to grant Maryland long arm jurisdiction in fact did not occur.

## THE FACTUAL RECORD DOES NOT SUPPORT MARYLAND LONG ARM JURISDICTION

At page 17 Ms. Misra makes the statement

> whether or not Xechem currently 'has' offices, bank accounts, or employees in Maryland, it is irrefutable that Xechem had an office and a senior employee in Maryland for a period of more than 15 years.

In the context of the second Burg Affidavit, attached to this Reply, the record she has documented shows that the relationship of Ms. Misra with Dr. Pandey existed prior to the formation of Xechem International and reflects, as she admits, the use of the funds of Xechem, Inc., the Illinois corporation, and not Xechem International, the Delaware corporation, to provide her with housing, etc.[2]

Mr. Burg explicitly made no comment as to the nature, if any, of the personal relationships between Ramesh Pandey and Ms. Misra that are present, other than to say there was no contract of employment, and that the salary payments purportedly ordered by Dr. Pandey were out of the financial assets of Xechem, Inc., the Illinois corporation, not a party to this proceeding. The W-2 statements attached to the Affidavit were also issued by Xechem, Inc., the Illinois corporation and not Xechem International and were not authorized by the directors.

Her exploitation of the Pandey Affidavit with pay check W-2's established that Xechem, Inc. had no offices in Maryland

In any event, Ms. Misra's affiant, supporter and good friend Dr. Pandey, had testified in a deposition in the Bristol-Myers anti-trust case on May 12, 2005,[3] which was totally at odds with her

---

[2]     Photos of the apartment complex where Ms. Misra lived and her newly acquired house are shown as attachments to the second Burg Affidavit.

[3]     It should be noted that the Bristol-Myers anti-trust case was hotly contested and was the subject of a decision in the Seventh Circuit in favor of Xechem, Inc. and Xechem International, Inc. reversing the decision of the trial court. *See Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899 (7th Cir. 2004). Excerpts from Dr. Pandey's deposition are attached to the second Affidavit of Stephen Burg.

claim to a Maryland office.

9

4    A.  My full name is Ramesh C. Pandey. I live at
5  30 South Adelaide Avenue in Highland Park, New Jersey.
6    Q.  And you work at Xechem International. Is that
7  correct?
8    A.  Yes.
9    Q.  In New Brunswick, New Jersey?
10   A.  New Brunswick, New Jersey.

12

3    Q.  You testified a moment ago that in 1977 to 1983 you
4  were with --
5    A.  National Cancer Institute.

\* \* \*

9    A.  With the Frederick Cancer Research Facility.
10   Q.  Frederick?
11   A.  Frederick Maryland, yes.[4]

22

16   Q.  Amongst your group of companies
17  Xechem International is at the top of the pyramid, right?
18   A.  Yes.
19   Q.  So then there's Xechem, Inc., and that's a
20  wholly-owned subsidiary of Xechem International. Is that
21  right?
22   A.  You are right.
23   Q.  Xechem International is located in New Brunswick,
24  New Jersey, right?

23

1    A.  You are right.

\* \* \*

23

11   Q.  So Xechem, Inc. physically exists within
12  Xechem International's space?
13   A.  You are right.
14   Q.  Does <u>Xechem International itself have any office</u>
15  <u>space anywhere else besides New Brunswick, New Jersey</u>?
16   A.  <u>No</u>. [*Emphasis supplied.*]

## THE NOTES SUED ON WERE MADE IN NEW JERSEY

Her reference at page 19 of her brief:

---

[4] Coincidentally, the location of Ms. Misra's apartment at 201A at the Hunter Glen Apartment in Frederick, MD.

Importantly, both Promissory Notes were executed by Misra in Maryland . . .

is a *non sequitur*. The lender does not execute a promissory note. Only the maker executes the note. On their face, they were executed in New Brunswick, N.J.

The definition of a note set forth in *Black's Law Dictionary*, 4th Edition, page 1210, defines a note as:

> a <u>unilateral</u> instrument containing an express and absolute promise of a signer to pay to a specified person or order or bearer a definite sum of money at a specified time. [*Citing case authority.*]

Whatever Ms. Misra did with regard to the notes asserted and attached to her Complaint, same was surplussage and did not constitute activity on the part of Xechem International in Maryland that would give rise to long arm jurisdiction.

## A VOID JUDGMENT MUST BE VACATED BY THIS COURT WHEN IT IS DETERMINED THAT THE ISSUING COURT DID NOT HAVE JURISDICTION

In the footnote at page 7, Ms. Misra cited *Board of Trustees Sheet Metal Workers v. Elite Erectors, Inc.*, 212 F.3d 1031 (7th Cir. 2000) as standing for the proposition that motions under Rule 60(b)(4) must establish a "meritorious defense." She refers to "60(b)" and not "(60(b)(4) which is different.

The *Sheet Metal Workers* case, a federal cause of action, not a diversity of citizenship case, was brought under ERISA. The court centered its opinion on Section 1132(e)(2), which it said gives nationwide authority to commence case in any other district where defendant resides or may be found. The court then said:

> That nationwide-service clause enabled the Eastern District of Virginia to acquire personal jurisdiction, the Funds contended, and required Skylight and Lowry to litigate in Virginia whether they were Elite's alter egos.

In the learned treatise of Wright and Miller at *Federal Practice and Procedure*, Section 2865, adopted by the *Sheet Metal Workers* court it was stated:

> Relief under Rule 60(b) ordinarily is obtained by motion in the court that rendered the judgment. If a judgment obtained in one district has been registered in another district, as provided by Section 1963 of Title 28, it is possible that the court in the district of registration has jurisdiction to hear a Rule 60(b)(4) motion. Indeed, several courts have ruled that it is proper for the registration court to entertain a Rule 60(b) motion when the basis of the motion is that the judgment is void for lack of jurisdiction.

The motion in question here is one to vacate the default judgment for want of jurisdiction and, therefore, pursuant to Rule 60(b)(4) is a void judgment. The rendering court was without jurisdiction over the Defendant.

## THIS COURT HAS NO DISCRETION. TO DO DUE PROCESS, THE SUPREME COURT HAS REQUIRED THAT IT RULE ON THE 60(b)(4) MOTION PRESENTED HERE[5]

In our primary brief, we previously cited *Harper McLeod, Solicitors v. Keaty and Keaty*, 260 F.3d 389, 394-95 (Fifth Cir. 2001), cited a year after the *Workers National Pension Fund* case. There is no direct rebuttal.

The Second Circuit, in *Cent. Vermont Pub. Serv. Corp. v. Herbert*, (2nd Cir. 2003) [internal citations and quotations omitted] said at 341 F.3d 186, 189:

> 'Under Rule 60(b)(4) a deferential standard of review is not appropriate because, if the underlying judgment is void, it is a *per se* abuse of discretion for a district court to deny a movant's motion to vacate the judgment under Rule 60(b)(4).' [*Citing authorities*.] . . . ('[T]he district court has no discretion [in ruling on a 60(b)(4) motion], the judgment either is void or it is not.') Almost every circuit has adopted *de novo* review of Rule 60(b)(4) motions, and we know of no circuit that defers to the District Court on a Rule 60(b)(4) ruling. . .

Mr. Justice Stone, in writing for the U.S. Supreme Court in *Adam v. Saenger*, 303 US 59 (1938). There, Justice Stone said:

> But in a suit upon the judgment of another state, the jurisdiction of the court which rendered it is open to judicial inquiry, *Chicago Life Insurance Company v. B Cherry*, 244 U.S. 25, 37 S.Ct. 492, 61 L.Ed. 966 (1917),

He continued:

> and when the matter of fact or law on which jurisdiction depends was not litigated in the original suit, it is a matter to be adjudicated in the suit founded upon the judgment.

The subject Judgment is a default judgment. The duty of this Court goes back to the founding of the nation and the Act of Congress of May 26, 1790. *See Thompson v. Whitman*, (18 Wall.) 85 U.S. 457, 21 L. ed. 897 (1873), which, in its syllabus stated:

> The record of a judgment rendered in another state may be contradicted as to the facts necessary to give the court jurisdiction, and if it be shown that such facts did

---

[5]    We attach in App. 2 a legislative history relevant to this Court's authority and duty to vacate the default judgment in issue for want of jurisdiction.

> not exist, the record will be a nullity notwithstanding it may recite that they did exist. . .

The Court in *Thompson* articulated the analogous authority underlying FRCP 60(b)(4) and the authority of the receiving court to rule upon the validity of the judgment sought to be enforced. It said:

> But if it is once conceded that the validity of a judgment may be attacked collaterally by evidence showing that the court had no jurisdiction, it is not perceived how any allegation contained in the record itself, however strongly made, can affect the right so to question it. . . . If that can be successfully done no statements contained therein have any force. . .

> Public policy and the dignity of the courts are supposed to require that no averment shall be admitted to contradict the record. But, as we have seen, that rule has no extra-territorial force.[6]

> \* \* \*

> It may be observed that no courts have more decidedly affirmed the doctrine that want of jurisdiction may be shown by proof to invalidate the judgments of the courts of other States, than have the courts of New Jersey. . . .

> 'Every independent government,' says the chief justice, 'is at liberty to prescribe its own methods of judicial process, and to declare by what forms parties shall be brought before its tribunals. But, in the exercise of this power, no government, if it desires extra-territorial recognition of its acts, can violate those rights which are universally esteemed fundamental and essential to society. Thus a judgment by the court of a State against a citizen of such State, in his absence, and without any notice, express or implied, would, it is presumed, be regarded in every external jurisdiction as absolutely void and unenforceable. . .'

> On the whole, we think it clear that the jurisdiction of the court by which a judgment is rendered in any State may be questioned in a collateral proceeding in another State, notwithstanding the provision of the fourth article of the Constitution and the law of 1790, and notwithstanding . . . the judgment itself.[7]

Justice Ginsburg referenced the District Court Opinion in *Practical Concepts v. The Republic of Bolivia*, 613 F.Supp. 863 (USDC DC 1985). *See* the references in our main brief to *Practical*

---

[6]    It is now governed by FRCP 60(b)(4) which has effectively done away with *coram nobis* and the like.

[7]    We attach as a separate but very important Appendix the legislative history of 28 U.S.C. 1963. (App. 2.) Article 4, Sec. 1 of the Constitution provides:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

*Concepts, Inc. v. The Republic of Bolivia*, 811 F.2d 1543 (DC Cir 1987), where the judge remanded back to District Judge Barrington D. Parker the case wherein Judge Parker had vacated the default judgment in favor of the plaintiff on the issue of the District Court's lack of jurisdiction with regard to same.

In *Practical Concepts*, the District Judge granted the motion to vacate the default judgment and to dismiss the suit for lack of personal and subject matter jurisdiction. In that case, like this case, writs of attachment had been served but were quashed by the District Court.

Procedurally, the District Judge relied upon the defendant's motion under Rule 60(b)(4) to vacate the default judgment on the issue of lack of jurisdiction.

There, the District Judge stated:

> The Court also notes that, when a party attacks a judgment for voidness, there is no requirement that he show the existence of a meritorious defense, as he must under other clauses of the rule.  Wright & Miller, § 2862 at 197.

Justice Ginsburg, in remanding the case, approved of the statement by the District Judge.

> Parenthetically, the Court notes that it finds nothing at all unreasonable in Bolivia's strategy of waiting until after execution of the judgment was under way to raise its jurisdictional point. . . a defendant who questions a court's jurisdiction over him is free to ignore the suit and attack the default judgment in a subsequent proceeding. . .

The District Court continued:

> The traditional rule is that a judgment rendered in excess of the court's jurisdiction is void and a legal nullity. Restatement of Judgments §§ 5-7 (1942).

He continued further:

> 'A defendant is always free to ignore the judicial proceedings, risk a default judgment and then challenge that judgment on jurisdictional grounds in a collateral proceeding.' *Insurance Corporation of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706, 102 S.Ct. 2099, 2106, 72 L.Ed.2d 492 (1982). *See also Baldwin v. Traveling Men's Association*, 283 U.S. 522, 525, 51 S.Ct. 517, 518, 75 L.Ed. 1244 (1931); *Maritime International Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1099 n. 9 (D.C.Cir.1982), cert. denied, 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983) (hereinafter "MINE "); *James & Hazard*, § 13.16 at 697; 59 A.L.R.Fed. 831 (1982).

Justice Ginsburg noted in the Appellate decision that the sole reason for reversing the matter for further consideration by the District Court was that it

> . . . rejected the district court's reasons for holding the contract "governmental," and finding no substantial basis to categorize the activity in question as something

> other than "commercial," we are unable to sustain the district court's judgment
> dismissing the action. . . we believe the district court should have the opportunity
> to consider, in the first instance, whether any of the other pleas raised by Bolivia
> merit continued vacation of the default judgment. We remand the case for that
> purpose.

The strong articulation by Justice Ginsburg in reviewing Judge Parker's erudite and scholarly opinion certainly merited a response from Ms. Misra.

Dr. Pandey is no longer an officer of Xechem International, Inc. and was not at the time the suit was filed in Baltimore.

Not only has he joined together with Ms. Misra in the instant case, which effectively is pending in the Northern District of Illinois, he has brought suit in his own name in a case entitled *Ramesh Pandey v. Xechem International, Inc.*, in the State of New Jersey in the Superior Court Of New Jersey, Law Division; Middlesex County, Docket No. MID-L-7192-07. He has had his brother, Bhuwan Pandey file suit in the U.S. District Court for the District of New Jersey, raising substantially the same issues. And he and his brother, *et al.*, are parties to proceedings pending in the High Court in New Delhi, India. The Movant asks the Court to take judicial notice of these filings, which are certified to be true and correct copies under Rule 109 of the Rules of the Supreme Court of Illinois.[8]

There is a view expressed by some courts that in the circumstances here it is the burden of Ms. Misra to establish that the Maryland court had jurisdiction under the Maryland long arm statute. In the case of *Packard Press Corp. v. Com Bu Corp.*, 584 F.Supp. 73 (ED Pa 1984), the court held that without further specification, the allegation of lack of jurisdiction in and of itself was a "meritorious defense" to the action. This is in addition to the other matters already raised by Xechem International.

## THE FAILED SERVICE OF A SUMMONS WAS A JURISDICTIONAL DEFECT, THE SAME AS THE LACK OF LONG ARM JURISDICTION

The circumstances here cry for an evidentiary hearing with regard to the service of process. The Affidavit filed by Leonard Mudry, previously honored, *en toto,* by the Federal Court in Newark, New Jersey, taken together with the circumstances present here, establish that the Maryland long arm statute was inapplicable to the wrongs complained of here.

---

[8]    The factual details are set forth in the detailed Affidavit filed in New Delhi proceedings. (App. 1, New Delhi pleadings.)

The facts establish that the subject application under Rule 60(b)(4) should be granted. *See Printed Media Services, Inc. v. Solna Web, Inc.,* 11 F.3d 838 (CA8 (Minn.), 1993), which establishes that Ms. Misra had every right to try and serve process on Xechem International's registered agent in Delaware. She was not authorized to claim that Leonard Mudry was the "implied agent" because as the court held in *Printed Media Services, supra,* the evidence, given the most favorable treatment of the Mudry Affidavit, shows that no agency relationship could be implied from the facts presented.

Ms. Misra's reliance on stale four and five year old securities filings, from a period of time when Mudry was an officer of the corporation, does not bootstrap it to the day upon which it is claimed that he was served, when he clearly was not an officer, agent or employee, or in charge of the business of the Xechem International company.

Nowhere has Ms. Misra presented facts that indicate that Leonard Mudry "had actual authority to receive service on Solna Delaware's [Xechem International] behalf or that Solna Delaware manifested consent for LT to have that authority . . ." *Printed Media Services* at page 842.

## MS. MISRA'S ESTOPPEL ARGUMENT IS INVERTED. SHE IS ESTOPPED, NOT XECHEM INTERNATIONAL

Ms. Misra, in her opposition brief, expends a significant portion of her page allowance on a collateral estoppel argument concerning the case of Bhuwan Pandey against Xechem International, Inc., in the U.S. District Court for the District of New Jersey (07-5123).

First, she charges issue preclusion as to the issue of the Leonard Mudry Affidavits, which were submitted to this Court in substantially the same form as that which they were submitted to the New Jersey District Court.

We invite the Court's attention to that court's Order of June 23, 2008 (App. 1). That Order is based upon that same Affidavit. The Order was captioned:

> ORDER QUASHING SERVICE OF PROCESS AND DISMISSING PLAINTIFF'S COMPLAINT PURSUANT TO FED.R.CIV.P. 12(B)(5) AS TO DEFENDANTS ROBERT SWIFT, STEVEN BURG, ADESOJI ADELAJA, AND MARTIN BIGGS
>
> IT IS on this 3 day of April, 2008,
>
> ORDERED, ADJUDGED AND DECREED that Service as to Defendants Robert Swift, Stephen Burg, Adesoji Adelaja and Martin Biggs shall be and same hereby is quashed; and it is further

It is further Ordered that plaintiff must re-serve within 30 days; and if not served within 30 days, the Complaint is dismissed without prejudice.

The Order dismissing the Complaint without prejudice is effective. More than 30 days have passed without a re-service.

It is apparent that Ms. Misra's advocates have studied the Bhuwan Pandey file in order to make the arguments from the transcripts, which they have used in their answering brief. There probably was a reason why they did not call to this Court's attention the earlier Order of the District Court of New Jersey with regard to quashing service of process on the same Affidavit of Leonard Mudry.

To proceed further, in an orderly fashion, we turn to the second order entered by the District Court of New Jersey in the Bhuwan Pandey case. There, the Court, on June 23, 2008, entered an Order ruling on Xechem International, Inc.'s

> "Cross-Motion to Quash Service and to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(5) Or, In The Alternative, Vacate The Entry Of Default Pursuant To Fed. R. Civ. P. 55(C) and Grant Leave For Xechem to File an Answer to the Complaint."

The Order provided *in haec verba*:

> This matter comes before the Court on Plaintiff's motion for default judgment and Defendant Xechem's cross motion to quash service and dismiss or vacate default. The Court has considered the parties' submissions. For the reasons set forth in the record, and for good cause having been shown,
>
> IT IS, on this 23rd day of June, 2008,
>
> ORDERED that Defendant's motion to quash service or to dismiss is denied; it is further
>
> ORDERED that Defendant's motion to vacate the entry of default is granted; it is further
>
> ORDERED that Defendant is granted 30 days from the date of this order to answer or otherwise plead; it is further
>
> ORDERED that Plaintiff's motion for default judgment is denied.

Xechem prevailed on its alternative motion.[9]

If there is to be an estoppel, it is Ms. Misra who is estopped. The mechanics of quashing the service to dismiss did not repudiate the Mudry Affidavit. The court granted the substance of the relief prayed for by Xechem in the alternative aspects of the motion.

---

[9]    Attached to the second Burg Affidavit.

The default was vacated, time to answer leave to file a response as prayed for was granted, and the motion for a default judgment was denied.

That is the precise alternative relief requested.

At page 10 of her brief, without reference to any testimonial or other evidentiary authority, and in reliance upon an argument made entirely by an attorney for Bhuwan Pandey, is the assertion that if Mudry were a director of the company that being a director would authorize the service of a summons upon him in New Jersey or that he is a shareholder and acted as a shareholder, he too could be the agent or the equivalent of the registered agent for the corporation. Inasmuch as the Mudry Affidavit (in the Bhuwan Pandey matter), as far as the first Order referred to above, was totally sustained, service was quashed and the Complaint was dismissed and has not been restored to vitality. The balance of her fallacious argument is without merit.

As we show from the documents attached to this Reply, Xechem International, Inc., a Delaware corporation, has officially designated a registered agent in Delaware, *to wit:* National Registered Agents, Inc., which Misra could have served effectively and efficiently. It is undisputed that Xechem International, Inc. is not a New Jersey corporation.

## MERITORIOUS DEFENSE IS NOT REQUIRED UNDER FRCP 60(b)(4)

At page 16 of her response, Ms. Misra argues the requirements of a meritorious defense to sustain a motion brought pursuant to FRCP 60(b)(4), citing *Merrill Lynch Mortgage vs. Narayan*, 908 F.2d 246, 252 (CA 7 1990). We call to the Court's attention that the relief sought by the defendant there was under Rule 55(c), which has the requirement of good cause, *i.e.* a meritorious defense, and Plaintiff later filed a motion under Rule 60(b), but not 60(b)(4). No jurisdictional issues were ruled upon.

In the instant case, Rule 60(b)(4) is referenced as creating authority for the vacation of the default judgment. A meritorious defense is not required. If it were, a lack of jurisdiction would be a meritorious defense, especially since it is the burden of the plaintiff in a diversity case to establish jurisdiction. As the court in *Merrill Lynch, supra*, noted, the provisions of Rule 60(b) are different than Rule 60(b)(4), as we set forth above, which has no meritorious defense requirement.

Ms. Misra has failed to meet her obligation to establish the jurisdiction of the Maryland District Court. She has failed to overcome the evidence surrounding the claimed service upon Leonard Mudry under Rule 4.

The Affidavit of Mudry establishes that Mudry had no broad vicarious responsibilities to

Xechem International to act on the company's behalf. Rather, he was an outside consultant who formerly had been an employee and officer. He was neither at the time of service an employee or officer, had no administrative or management responsibilities, and in no way was authorized to act on behalf of the corporation.

The fact that he was a consultant and a contractor was not sufficient to make him an agent of the company authorized to receive service of process. What a person "used to be" is not much good for determining whether a person is in fact so authorized, even if that person claims that he is authorized. Whether or not Mudry may have been an officer at one time does not authorize him to receive service when that is no longer the case – for instance, Dr. Pandey himself used to be CEO.

There was no showing that Leonard Mudry had any familiarity with the formalities associated with receiving service of process and, indeed, no idea what the papers with which he been served were or what to do with them. Clearly, he was not authorized to receive service under New Jersey law, because he was neither an agent of Xechem International, nor transacting the business of Xechem International. And even if he were a shareholder, shareholder status does not confer agency or management authority upon him.

Under Rule 4, Ms. Misra is obligated to serve Xechem International pursuant to the law of New Jersey. She could have served the registered agent in Delaware where Xechem International is incorporated or some other party with actual authority under the law. She elected not to do so.

## CONCLUSION

Xechem International's motion under Rule 60(b)(4) is based upon the charge that the judgment was a "void judgment" not one that was merely "voidable." If the Maryland District Court didn't have jurisdiction, then it was totally beyond the court's power to render a judgment. *Kalb v. Feuerstein*, 308 U.S. 433, 438 (1940). In that case the bankruptcy automatic stay was in effect and the state court was barred from foreclosing on property and therefore it was not merely an erroneous order, but it was void for exceeding the power of the court.

The facts as claimed by Xechem International clearly establish that the default judgment in question is void because the court lacked power to exercise personal jurisdiction over Xechem International. Xechem International lacks sufficient contacts with the District of Maryland in which the court sat so that it was a denial of due process for the Maryland court to exercise personal jurisdiction over Xechem International, Inc. based upon the Maryland long arm statute.

The efforts by Ms. Misra to bootstrap the relationship she has had with Dr. Pandey by

claiming that her apartment and her new house were each offices of Xechem International are clearly contrary to the facts and the evidence supplied. Xechem International has included in the filing here photographs of the apartment building and the house in question, which Ms. Misra attempts to claim are the offices of Xechem International, which they were clearly not. (Burg's second Affidavit.) The Affidavit of the longest serving director of the company, Stephen Burg, is to that effect. Dr. Pandey's testimony in the anti-trust case involving Bristol-Myers of only few years ago unequivocally established that Xechem had no offices outside of New Brunswick, New Jersey in the United States. That is the same Dr. Pandey who furnished the voluminous Affidavit, apparently drafted by counsel, for submission in this proceeding.

There is no claim by Ms. Misra that there has been a waiver by Xechem International with regard to the personal jurisdiction over Xechem International.

Unlike other motions made pursuant to Rule 60, motions made pursuant to Rule 60(b)(4) differ from all other Rule 60(b) motions. If the Court determines that the judgment below is void, it must grant relief and the District Court must set it aside. *Carimi v. Royal Caribbean Cruise Line*, 959 F.2d 1344, 1345 (CA 5 1992).

Judge Posner, in *Marques v. Federal Reserve Bank*, 286 F.3d 1014, 1017-18 (CA7 2002), stated:

> *In re Edwards*, 962 F.2d 641, 644 (7th Cir. 1992), the refusal to vacate under Rule 60(b)(4) an unarguably void judgment is an abuse of discretion. *Robinson Engineering Co., Ltd. Pension Plan & Trust v. George*, 223 F.3d 445, 448 (7th Cir. 2000); *Blaney v. West*, 209 F.3d 1027, 1031 (7th Cir. 2000); *United States v. Indoor Cultivation Equipment From High Tech Indoor Garden Supply*, 55 F.3d 1311, 1317 (7th Cir. 1995); *see generally Hertz Corp. v. Alamo Rent-A-Car, Inc.*, 16 F.3d 1126, 1130 (11th Cir. 1994); *Williams v. Brooks*, 996 F.2d 728, 730 (5th Cir. 1993) (per curiam); *Jalapeno Property Management, LLC v. Dukas*, 265 F.3d 506, 515-16 (6th Cir. 2001) (concurring opinion).

To the same effect, *Peralta v. Heights Medical Center*, 485 U.S. 80, 84. *See Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649 (CA 5 1988), where the court said:

> When, however, a district court lacks jurisdiction over the defendant because of lack of service of process, the judgment is void and, under Rule 60(b)(4), the district court must set it aside, *Recreational Properties v. Southwest Mortg. Service*, 804 F.2d 311, 314 (5th Cir. 1986), regardless of whether the movant has a meritorious defense, *Broadcast Music, Inc. v. M.T.S. Enterprises*, 811 F.2d 278, 280 (5th Cir. 1987); see also *Peralta v. Heights Medical Center, Inc.*, --- U.S. ----, 108 S.Ct. 896, 99 L.Ed.2d 75 (1988); *Miner v. Punch*, 838 F.2d 1407, 1410 (5th Cir. 1987). Furthermore, there is generally no timeliness requirement applicable to

a Rule 60(b)(4) motion. See generally 11 C. Wright & A. Miller, *Federal Practice and Procedure* Sec. 2862 at 197 (1973).

In our original Memorandum of Law, starting at page 5, we invited the Court's attention to *Kulko v. Superior Court of California*, 436 U.S. 84, which gave the exposition of the basic Supreme Court approach to this situation. Other than carrying on the argument in the footnotes at page 7 of her 24 page answering brief, she totally ignores the Supreme Court's writings. This issue is not new to the Supreme Court and has had a long history from the language used.

For example, the validity of an order of a federal court depends upon the court's having jurisdiction over both the subject matter and the parties. *Insurance Corp. v. Compagnie des Bauxites*, 456 U.S. 694 (1982), *Stol v. Gottlieb*, 305 U.S. 165 (1938), and, as far back as 1873, in *Thompson v. Whitman*, 85 U.S. (18 Wall.) 457 (1873). The point, which is well known by this court, is that federal courts are courts of limited jurisdiction.

The character of the controversies over which federal judicial authority may extend are delineated in Article 3, Section 2, Clause 1 of the Constitution. Jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction.

In *Insurance Corp., supra*,

> Thus, the consent of the parties is irrelevant, [*citing authority*], principles of estoppel do not apply, [*citing authority*], and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings. Similarly, a court, including an appellate court, will raise lack of subject-matter jurisdiction on its own motion. '[T]he rule, springing from the nature and limits of the judicial power of the United States is inflexible and without exception, which requires this court, of its own motion, to deny its jurisdiction, and, in the exercise of its appellate power, that of all other courts of the United States, in all cases where such jurisdiction does not affirmatively appear in the record.' [*Citing authority.*] .
> . .
>
> A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding.

More factual matters have been submitted to this Court for the Northern District of Illinois than were ever considered by the District Court in Maryland. Ms. Misra, in her responsive memorandum, refers to the *ex parte* prove up proceeding. But even though it appears that it might have been available, no transcript of the evidence taken in the Maryland District Court was ever submitted to this Court for its consideration, nor was any other evidence presented at the *ex parte*

prove up.

WHEREFORE DEFENDANT XECHEM INTERNATIONAL, INC. PRAYS

First, that this Court find that, as a matter of fact, the U.S. District Court for the District of Maryland was without jurisdiction under the long arm statute of the State of Maryland or on any other basis to enter the Judgment heretofore filed in this cause pursuant to the provisions of 28 U.S.C. 1963; and further

Second, that it be ordered by the Court that said Judgment, being the Judgment of March 31, 2008, entered in favor of the Plaintiff Renuka Misra in the sum of $1,000,000, together with post-judgment interest of $491,145.57, together with post-judgment interest in the sum of $508,854.43 and other matters so contained therein, together with the amendment of said Judgment of May 7, 2008, all in the matter described as *Renuka Misra v. Xechem International, Inc.*, Civil Docket No. 1-8-CV-00307-AMD in the United States Court for the District of Maryland (Baltimore) and that same be vacated and for naught esteemed;

Third, that the claim of the Plaintiff Renuka Misra shall be dismissed for want of jurisdiction;

Fourth, that this Court, in the alternative, set this matter for oral hearing with regard to the matters relating to the issue of long arm jurisdiction under the Maryland statute; and further,

Fifth, that the Defendant have such other, further and different relief as the Court may deem just in the circumstances.

September 5, 2008

Respectfully submitted,

XECHEM INTERNATIONAL, INC. a
Delaware corporation, Defendant

By:  /s/ Kenneth A. Henry
     Kenneth A. Henry, Its Attorney

Kenneth A. Henry  (ARDC #1193457)
One North LaSalle Street, #2200
Chicago, IL 60602-3912
Tel. (312) 857-0100 / Fax: (312) 857-1157
khenry@kahlaw.com

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

RENUKA MISRA,

    Plaintiff,

        vs.

XECHEM INTERNATIONAL INC.,

    Defendant.

Civil Action No. 08-CV-03231

Honorable James B. Moran

## APPENDIX TO REPLY BRIEF
## FILED ON BEHALF OF XECHEM INTERNATIONAL, INC.

1.  Sworn Complaint supported by the affidavit of Shekhar K. Basu of Heathcote Drive, Mt. Kisco, New York, 10549, filed in the High Court of Delhi at New Delhi, Case no. 21512007 entitled *In the Matter of Xechem International and Xechem Pharmaceuticals Nigeria, Ltd. v. Xechem (India) Pvt. Ltd., Dr. Ramesh Chandra Pandey, Shri Bhuwan Chandra Pandey, Shri Bhairab Dutt Pandey, Pant Nagar University of Agriculture and Technology*, all as defendants. Which contains a detailed statement of the relevant facts with regard to the relationship between Dr. Ramesh Pandey and Xechem International, Inc.

2.  Appendix outlining the legislative history 28 USC 1963 from various sources, together with Public Law 86-754 authorizing the publication of the U.S. Constitution Annotated.

# PUBLIC LAW 86-754

JOINT RESOLUTION Authorizing the preparation and printing of a revised edition of the Constitution of the United States of America— Analysis and Interpretation, published in 1953 as Senate Document Numbered 170 of the Eighty-second Congress.

Whereas the Constitution of the United States of America—Analysis and Interpretation, published in 1953 as Senate Document Numbered 170, Eighty-second Congress, serves a very useful purpose by supplying essential information;

Whereas such document contains annotations of cases decided by the Supreme Court of the United States to June 30,1952; and

Whereas many cases bearing upon the analysis and interpretation of the Constitution have been decided by the Supreme Court since June 30, 1952: Now, therefore, be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Librarian of Congress is authorized and directed to have prepared a revised edition of the Constitution of the United States of America—Analysis and Interpretation, published as Senate Document Numbered 170, Eighty-second Congress, which shall contain annotations of decisions of the Supreme Court of the United States after June 30, 1952, construing the several provisions of the Constitution. Such revised edition shall be printed as a Senate document, and three thousand and twenty-nine additional copies shall be printed, of which two thousand two hundred and five copies shall be for the use of the House of Representatives and eight hundred and twenty-four copies shall be for the use of the Senate.

SEC. 2. There are authorized to be appropriated such sums, to remain available until expended, as may be necessary to carry out the provisions of this joint resolution.

Approved September 13, 1960.

# APPENDIX

## THE LEGISLATIVE HISTORY APPLICABLE TO 28 USC 1963

### Sec 1—Full Faith and Credit: Judicial Proceedings

\*\*\*

#### Jurisdiction: a Prerequisite to Enforcement of Judgments

The jurisdictional question arises both in connection with judgments *in personam* against nonresident defendants to whom it is alleged personal service was not obtained in the State originating the judgment, and in relation to judgments *in rem* against property, or a status alleged not to have been within the jurisdiction of the court which handed down the original decree. Records and proceedings of courts wanting jurisdiction are not entitled to credit.

*Judgments* **in personam.**—When the subject matter of a suit is merely the defendant's liability, it is necessary that it should appear from the record that the defendant has been brought within the jurisdiction of the court by personal service of process, or his voluntary appearance, or that he had in some manner authorized the proceeding. Thus, when a State court endeavored to acquire jurisdiction of a nonresident defendant by an attachment of his property within the State and constructive notice to him, its judgment was defective for want of jurisdiction, and hence could not afford the basis of an action against the defendant in the court of another State, although it bound him so far as the property attached by virtue of the inherent right of a State to assist its own citizens in obtaining satisfaction of their just claims. [*U.S. Constitution, Annotated*, pp 746-747.]

## FULL FAITH AND CREDIT IN FEDERAL COURTS

. . . the rule comprised therein pertains not merely to recognition by State courts of the records and judicial proceedings of courts of sister States but to recognition by "every court within the United States," including recognition of the records and proceedings of the courts of any territory or any country subject to the jurisdiction of the United States. The federal courts are bound to give to the judgments of the State courts the same faith and credit that the courts of one State are bound to give to the judgments of the courts of her sister States. So, where suits to enforce the laws of one State are entertained in courts of another on principles of

2

comity, federal district courts sitting in that State may entertain them, and should, if they do not infringe federal law or policy. However, the refusal of a territorial court in Hawaii, having jurisdiction of the action which was on a policy issued by a New York insurance company, to admit evidence that an administrator had been appointed and a suit brought by him on a bond in the federal court in New York wherein no judgment had been entered, did not violate this clause.

The power to prescribe what effect shall be given to the judicial proceedings of the courts of the United States is conferred by other provisions of the Constitution, such as those which declare the extent of the judicial power of the United States, which authorize all legislation necessary and proper for executing the powers vested by the Consitution in the Government of the United States, and which declare the supremacy of the authority of the National Government within the limits of the Constitution. As part of its general authority, the power to give effect to the judgment of its courts is coextensive with its territorial jurisdiction. [*U.S. Constitution, Annotated*, pp 772-773.]

The Supreme Court said in *Embry v. Palmer*, 107 US 3, 9 (1883):

Section 905, Rev. St., which embodies the original act of 1790, and the supplement thereto of 1804, provides that the records and judicial proceedings, not only of the courts of any state, but also of any territory or of any country subject to the jurisdiction of the United States, authenticated as therein prescribed,

'shall have such faith and credit given to them, in every court within the United States, as they have by law or usage in the courts of the state from which they are taken;'

which, by supplying the ellipsis, must be taken to mean, such faith and credit as they are entitled to in the courts of the state, territory, or other country subject to the jurisdiction of the United States from which they are taken.

So far as this statutory provision relates to the effect to be given to the judicial proceedings of the states, it is founded on article 4, 1, of the constitution, which, however, does not extend to the other cases covered by the statute. The power to prescribe what effect shall be given to the judicial proceedings of the courts of the United States is conferred by

3

other provisions of the constitution,-such as those which declare the extent of the judicial powers of the United States,-which authorize all legislation necessary and proper for executing the powers vested by the constitution in the government of the United States, or in any department or officer thereof, and which declare the supremacy of the authority of the national government within the limits of the constitution. As part of its general authority, the power to give effect to the judgment [107 U.S. 3, 10] of its courts is co-extensive with its territorial jurisdiction. That the supreme court of the District of Columbia is a court of the United States, results from the right which the constitution has given to congress of exclusive legislation over the district. Accordingly, the judgments of the courts of the United States have invariably been recognized as upon the same footing, so far as concerns the obligation created by them, with domestic judgments of the states, wherever rendered and whereever sought to be enforced. Barney v. Patterson, 6 Har. & J. 182; Niblett v. Scott, 4 La. Ann. 246; Adams v. Way, 33 Conn. 419; Womack v. Dearman, 7 Porter, 513; Pepoon v. Jenkins, 2 Johns. Cas. 119; Williams v. Wilkes, 14 Pa. St. 228; Turnbull v. Payson, 95 U.S. 418; Cage's Ex'rs v. Cassidy, 23 How. 109; Galpin v. Page, 3 Sawy. 93-109.

The rule for determining what effect shall be given to such judgments is that declared by this court, in respect to the faith and credit to be given to the judgments of state courts in the courts of other states, in the case of McElmoyle v. Cohen, 13 Pet. 312, 326, where it is said:

> 'They are record evidence of a debt, or judgments of record, to be contested only in such a way as judgments of record may be; and, consequently, are conclusive upon the defendant in every state, except for such causes as would be sufficient to set aside the judgment in the courts of the state in which it was rendered.'

## History of Full Faith and Credit

Article IV Sec. 1 of the Constitution provides:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

4

A similar clause existed in Article IV of the Articles of Confederation, the predecessor to the U.S. Constitution: "Full faith and credit shall be given in each of these States to the records, acts, and judicial proceedings of the courts and magistrates of every other State." A Pennsylvania court explained in 1786 that this provision in the Articles of Confederation did not direct that "executions might issue in one state upon the judgments given in another", but rather was "chiefly intended to oblige each state to receive the records of another as full evidence of such acts and judicial proceedings."

The history of 28 USC 1963 originated at the Philadelphia Convention. James Madison said that he wanted to supplement that provision in the Articles of Confederation, in order to let Congress "provide for the execution of Judgments in other States, under such regulations as might be expedient." By September 1 of 1787, negotiations at the Constitutional Convention had led to the following draft which included supplementary language as Madison had requested:

> Full faith and credit ought to be given in each state to the public acts, records, and judicial proceedings, of every other state; and the legislature shall, by general laws, prescribe the manner in which such acts, records, and proceedings, shall be proved, and the effect which judgments, obtained in one state, shall have in another.

After several further modifications, the Full Faith and Credit Clause assumed the form in which it remains today. During the ratification process, James Madison remarked further on this subject, in Federalist #42. He wrote that the corresponding clause in the Articles of Confederation was "extremely indeterminate, and can be of little importance under any interpretation which it will bear." Of the expanded clause in the Constitution, Madison wrote that it established a power that "may be rendered a very convenient instrument of justice, and be particularly beneficial on the borders of contiguous States."

At the Philadelphia Convention, James Madison said that he wanted to supplement that provision in the Articles of Confederation, in order to let Congress "provide for the execution of Judgments in other States, under such regulations as might be expedient." By September 1 of 1787, negotiations at the Constitutional Convention had led to the following draft which included supplementary language as Madison had requested:

> Full faith and credit ought to be given in each state to the public acts, records, and judicial proceedings, of every other state; and the legislature shall, by general laws, prescribe the manner in which such acts, records, and proceedings, shall be proved, and the effect which judgments, obtained in one state, shall have in another.

After several further modifications, the Full Faith and Credit Clause assumed the form in which it remains today.

In 1790, shortly after the Constitution had been ratified, Congress took action under the Full Faith and Credit Clause, enacting that "the records and judicial proceedings, authenticated as aforesaid, shall have such faith and credit given to them in every Court within the United States, as they have by law or usage in the Courts of the state from whence the said records are or shall be taken." In 1813, the United States Supreme Court interpreted this federal statute, in the leading case of *Mills v. Duryee*, 11 U.S. (7 Cranch) 481 (1813). Justice Joseph Story wrote for the Court that it was the federal statute (rather than the constitutional provision) that made records from one state effective in another state:

> It is argued, that this act provides only for the admission of such records as evidence, but does not declare the effect of such evidence, when admitted. This argument cannot be supported. The act declares, that the record, duly authenticated, shall have such faith and credit as it has in the state court from whence it is taken. If in such court it has the faith and credit of evidence of the highest nature, viz., record evidence, it must have the same faith and credit in every other court.[1]

Section 1963, which provides the mechanism to give full faith and credit to judgments in other District Courts, follows the recommendations of the Supreme Court's Advisory Committee on Fed.R.Civ.P. (1937). The Committee proposed Rule 77, 'Registration of Judgments in Other District Courts,' but the rule was never promulgated by the Supreme Court as a rule of procedure. Instead Congress enacted 1963, which contained language similar to that in proposed Rule 77, as a part of the Judicial Code of 1948.

Except for a statement by Professor James William Moore of Yale Law School, there is no legislative history specifically on 1963. On March 7, 1947, Professor Moore made the following statement before a subcommittee of the Committee on the Judiciary of the House of Representatives:

> [28 USC] '1963 provides for the registration of Federal judgments for the recovery of money or property in any other Federal district court. Provision for the registration of judgments in other courts is possible in some 46 British jurisdictions, and has been supported as to all judgments, State as well as Federal, by the American Bar Association, which has advocated congressional legislation in this matter since 1927.
>
> 'The Supreme Court's advisory committee recommended a rule for the recognition of Federal judgments in 1937, but the Supreme Court did not promulgate the rule. While this may or may not be within the competence of the rule-making

---

[1]   See 28 USC 1738.

> power, it is certainly within the competence of Congress at
> this time to provide for the registration of Federal
> judgments.' Hearings on H.B. 3214 Before a Subcommittee
> of the House Committee on the Judiciary, 80th Cong., 1st
> Sess., ser. 2, at 28 (1947).

The following is the text of proposed Rule 77 as contained in the final report of the Advisory Committee to the Supreme Court:

> 'Rule 77. Registration of Judgments in other District Courts.
> A judgment entered in any district court and which has
> become final through expiration of the time for appeal or by
> mandate on appeal may be registered in any other district
> court by filing therein an authenticated copy of the judgment.
> When so registered the judgment shall have the same effect
> and like proceedings for its enforcement may be taken
> thereon in the court in which it is registered as if the
> judgment had been originally entered by that court. If in the
> court in which the judgment was originally entered, the
> judgment has been satisfied in whole or in part or if an order
> has been made modifying or vacating it or affecting or
> suspending its operation, the party procuring the registration
> shall and any other party may file authenticated copies of the
> satisfaction or order with the court in which the judgment is
> registered. This rule shall not be construed to limit the effect
> of the Act of February 20, 1905, c. 592, 20 (33 Stat. 729), as
> amended, U.S.C., Title 15, 100; or the Act of March 4, 1909,
> c. 320, 36 and 37 (35 Stat. 1084), U.S.C., Title 17, 36 and
> 37; or 56 of the Judicial Code, U.S.C.., Title 28, 117; or to
> authorize the registration elsewhere of an order or a
> judgment rendered in a divorce action in the District of
> Columbia.'

The note of the Advisory Committee on proposed Rule 77 was as follows:

> 'Compare the provisions of U.S.C., Title 28, 252 (Judgments
> for set-off or counterclaims) for the registration of judgments
> of the Court of Claims in favor of the United States. 'Any
> transcript of such judgment, filed in the clerk's office of any
> district court, shall be entered upon the records thereof, and
> shall thereby become and be a judgment of such court and be
> enforced as other judgments in such court are enforced.'

> 'Provision for the registration of judgments in other courts is
> possible in some 46 British jurisdictions; and has been
> supported as to all judgments, state as well as federal, by the
> American Bar Association, which has advocated

congressional legislation in this matter since 1927. See 52
A.B.A.Rep. 77-85, 292-310 (1927), and draft of an act at
page 319; W. W. Cook, The Powers of Congress Under the
Full Faith and Credit Clause (1919), 28 Yale L.J. 421-449;
Yntema, The Enforcement of Foreign Judgments in Anglo-
American Law (1935), 33 Mich.L.Rev. 1128, 1150 et seq.;
G. W. C. Ross, Full Faith and Credit in a Federal System
(1936), 20 Minn.L.Rev. 140-190.'

## Source and Evolution of the Meaning of the Term Due Process Of Law

The phrase "due process of law" comes from chapter 3 of 28
Edw. Ill (1355), which reads: "No man of what state or
condition he be, shall be put out of his lands or tenements
nor taken, nor disinherited, nor put to death, without he be
brought to answer by due process of law." This statute, in
turn, harks back to the famous chapter 29 of Magna Carta
(issue of 1225), where the King promises that "no free man
(*nullus liber homo*) shall be taken or imprisoned or deprived
of his freehold or his liberties or free customs, or outlawed or
exiled, or in any manner destroyed, nor shall we come upon
him or send against him, except by a legal judgment of his
peers or by the law of the land (*fer legem terrae*)." Coke in
Part II of his *Institutes*, which was the source from which the
founders of the American Constitutional System derived
their understanding of the matter, equates the term "by law of
the land" with "by due process of law," which he in turn
defines as "by due process of the common law," . . . or by
writ original of the Common Law." The significance of both
terms was therefore purely procedural; the term "writ
original of the common law" referring to the writs on which
civil actions were brought into the King's courts; and this is
the significance they clearly have in the State constitutions.
In the earlier of such instruments the term "law of the land"
was the form preferred, but following the adoption of
Amendment 5 "due process of law" became the vogue with
constitution     draftsmen.[*Comments,     US     Constitution,
Annotated*, pg 959.]

1093659

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

RENUKA MISRA,

     Plaintiff,

       vs.

XECHEM INTERNATIONAL INC.,

     Defendant.

Docket No. 08-CV-03231

Honorable James B. Moran

## <u>AFFIDAVIT OF STEPHEN BURG</u>

STEPHEN BURG being first duly sworn upon his oath deposes and says:

1.     He is and has been a director of Xechem International, Inc. for more than ten years last passed.

2.     If he were called as a witness in this cause, he could and would testify as to the following matters and things.

3.     I have reviewed the Affidavit of Ramesh Pandey dated August 1, 2008, and filed by Dr. Pandey in opposition to the Motion of Xechem International, Inc. to vacate the default judgment in issue in this proceeding.

4.     Dr. Pandey has attached as exhibits material for the purpose of seeking to induce the District Court for the Northern District of Illinois to believe that Renuka Misra, with whom I am personally acquainted, was employed by Xechem International, Inc., a Delaware corporation, and the defendant in the case now pending in the United States District Court for the Northern District of Illinois.

5.      Dr. Pandey has attached to his Affidavit, and incorporated therein, exhibits which incorrectly assert that it establishes that Ms. Misra was employed by Xechem International, Inc.

6.      I have been asked to review exhibits in the order in which they appear in the Ramesh Pandey Affidavit.

7.      Affiant states that there are two corporations referenced by Pandey in his Affidavit. One is an Illinois corporation, Xechem, Inc., which was neither a party to the proceeding here in the Northern District of Illinois, nor was it a party to the proceeding in the District of Maryland.

8.      Xechem, Inc., the Illinois corporation, from time to time uses the term "Xechem, Inc." to identify itself.

9.      In Exhibit A, both business cards attached thereto claim, according to Dr. Pandey, that Ms. Misra had an office of Xechem, Inc. in her apartment, Unit 201-A at 1405 Key Parkway East, in Frederick, Maryland.

10.     Nowhere on either business card attached to the Pandey Affidavit is any reference made to Xechem International, Inc., a Delaware corporation, and the party against whom the default judgment was entered and that is pursuing the instant Motion to vacate that default judgment.

11.     In Exhibit B attached to Dr. Pandey's Affidavit, he attaches thereto a letter of July 19, 1995, addressed to Ms. Misra. It refers to the Xechem business, and the letterhead bears the

identification "Xechem, Inc." As the Court will note, the printed identification on the letterhead has no relationship to Xechem International, Inc., a Delaware corporation, the judgment creditor.

12.     In this Affidavit, I have not, and I do not make any observation at this time with regard to the personal relationship between Ms. Misra, one of Dr. Pandey's former students, and the referenced residential accommodations during the period in which she now claims to have been an employee of Xechem International, Inc., the Delaware corporation. I have specifically refrained from any observation as to any reason why Xechem, Inc., the Illinois corporation, was responsible for the rent of Apartment 201A, at 1405 Key Parkway, Frederick, MD, 21702, occupied by Ms. Misra. Such reason is unknown to me.

13.     I attach hereto two printouts from the web site of the Maryland Department of Assessments and Taxation, Taxpayers Services Division, 301 W. Preston Street, Baltimore, MD, dated August 5, 2008. Each reflect a charter search result to the effect that the record fails to show that either Xechem, Inc., an Illinois corporation, or Xechem International, Inc., a Delaware corporation, was ever authorized to do business in Maryland. It is my own personal knowledge that neither corporation ever did business in Maryland. As a board member, it was never disclosed that the Company had any kind of rental obligations in Maryland.

14.     I have caused an internet search to be made with regard to the phone number in Maryland indicated on the business cards attached to Dr. Pandey's Affidavit. The search has shown Ms. Misra as the subscriber and not Xechem, Inc. In my opinion the listing on the business card is not *bona fide* (report attached). There is no reason known to me why Xechem, Inc. should be responsible for the telephone bill at Ms. Misra's apartment.

15.     I have caused a search to be made in the Internet and attach hereto the Google and Yahoo printouts of 1405 Key Parkway, Frederick, Maryland, which shows Hunters Glen Apartments, which is the address furnished in Dr. Pandey's Affidavit with Ms. Misra's business card. The Hunters Glen Apartments complex, which is shown on the attachment, is a rental community that is described as "comfortable lifestyle" and "easy living." It is clearly not an office complex, nor has Xechem, Inc. ever had an office at 1405 Key Parkway, Frederick, Maryland, as claimed in the Affidavits filed by Ms. Misra in support of her objections to the subject Motion.

16.     It has been called to my attention that the affiant Ramesh Pandey, whose affidavit was filed by the Plaintiff in this cause, did on or about May 12, 2005, give his deposition in a case entitled *Xechem Inc., an Illinois corporation, and Xechem International, Inc., a Delaware corporation, v. Bristol-Myers Squibb Company*, in the U.S. District Court for the Northern District of Illinois, 03 C 1920.

17.     I learned from the transcript of that deposition, that he testified that his connection with Frederick, Maryland, was during a period that he was employed by the National Cancer Institute and with the Frederick Cancer Research Facility at Frederick, Maryland.  He testified that he was working on anti-cancer drugs and that he was instrumental in solving the problems they had.

18.     Dr. Pandey testified in 2005 in the deposition for use in this Court as follows (transcript pages attached):

                2   Q.  Let me, let me ask you, first of all, to state your
                3   full name and address for the record.

- 4 -

4     A.   My full name is Ramesh C. Pandey.  I live at
5  30 South Adelaide Avenue in Highland Park, New Jersey.
6     Q.   And you work at Xechem International.  Is that
7  correct?
8     A.  Yes.
9     Q.  In New Brunswick, New Jersey?
10    A.   New Brunswick, New Jersey.

page 9, lines 2-10

6     Q.   National Cancer Institute.  I think I may have
7  missed something in there.  Were you with some particular
8  clinic or --
9     A.   With the Frederick Cancer Research Facility.
10    Q.   Frederick?
11    A.   Frederick Maryland, yes.
12    Q.   What was the nature of the work that you did while
13 you were at the NCI?
14    A.   I was working on anticancer drugs.  They had a
15 problem which they were struggling for few years, and I was
16 instrumental in solving that problem.

page 12, lines 6-16

23  Q.   Xechem International is located in New Brunswick,
24 New Jersey, right?
1     A.   You are right.
2     Q.   You have some office space there, correct?
3     A.   Yes.
4     Q.   Do you know about how much space you have in
5  New Brunswick?
6     A.   We have about 30,000 square foot.
7     Q.   Does Xechem, Inc. have any office space separate --
8     A.   Yes.
9     Q.   -- from Xechem International?
10    A.   No.
11    Q.   So Xechem, Inc. physically exists within
12 Xechem International's space?
13    A.   You are right.
14    Q.   Does Xechem International itself have any office
15 space anywhere else besides New Brunswick, New Jersey?
16    A.   No.

page 22, lines 23 through page 23, line 16

19.    I have noted that Dr. Pandey did not testify as to the existence of any office in the

State of Maryland, there being none.

20.     In the Complaint attached to Ms. Moylan's Affidavit, she now states at Paragraph 7:

> At all times relevant to this complaint, Dr. Misra, in her capacity as an employee of Xechem, worked out of Xechem's New Brunswick, New Jersey, and Gaithersburg, Maryland offices.

On that Affidavit, the file stamp shows that that pleading was filed on February 4, 2008, at the hour of 3:27 p.m., with the court in Baltimore.

21.     Again, I have caused a search to be made on the Internet and I attach the Google and Yahoo printouts as exhibits that show that the so-called Gaithersburg, Maryland office for Xechem International, Inc., is the residence and home of Ms. Misra at 12106 Pawnee Drive, Gaithersburg, MD 20878, with the listed telephone number of 301-330-5098. A copy of the Listing Detail is attached to this Affidavit.

22.     I also secured from the Internet an aerial photograph of the home at 12106 Pawnee Drive referred to by the Plaintiff, both in the Complaint at Paragraph 7, and in the Opposition to the Motion of Xechem International, Inc. pending before the Court. I have observed that that address is in an area of residential homes, does not appear to be an office, nor is it listed in any directory that discovery could reach that it was, in fact, the office of Xechem International, Inc. as was alleged at Paragraph 7 in the Complaint and in fact alleged in Ms. Misra's Opposition to the Motion of Xechem International, Inc. to which this Affidavit is addressed.

23.     At Exhibit C attached to his Affidavit, Dr. Pandey attaches checks for varying amounts drawn on the account of Xechem, Inc., the Illinois corporation, and not Xechem International, Inc., the Delaware corporation. Each check attached as part of Exhibit C to the

order of Ms. Misra is drawn on the account of Xechem, Inc., the Illinois corporation, and not on the account of Xechem International, Inc., the Delaware corporation.

24.     At Exhibit D attached to his Affidavit, Dr. Pandey attaches withholding tax statements for the year 2007, issued by Xechem, Inc., with Employer's Identification No. 36-3696864, which is that of Xechem, Inc., an Illinois corporation, payable to Renuka Misra, SSN ████████

25.     Exhibit G attaches certain interest checks from the year 2007, each of which is drawn on the account of Xechem, Inc., not on the account of Xechem International, Inc. Each is addressed to Ms. Misra at her apartment in Frederick, Maryland, for interest on the long terms loans ostensibly identified in Dr. Pandey's affidavit as being made to Xechem, International, Inc., the Delaware corporation.

26.     Whatever relationships, if any, that Ms. Misra had, they were with Xechem, Inc. and not with Xechem International, Inc.

27.     Proceeding further, I have been furnished with the Affidavit a lawyer for Ms. Misra, Leslie G. Moylan. In that regard, the Affiant can state as follows:

28.     In the Complaint attached to Ms. Moylan's Affidavit, Ms. Misra makes a judicial admission that the address at 1405 Key Parkway East, Unit 201-A, Frederick, Maryland, 210, is her apartment and fails to state (and thereby omits) whether or not it is the office of Xechem International, Inc., as she has alleged in this proceeding.

29.     At Paragraph 2 of Exhibit B attached to that Affidavit, she judicially admits that Xechem International, Inc. is a Delaware corporation with its principal place of business at

Edison, NJ. In her Complaint, she uses "Xechem" as a defined term, referring to "Xechem International, Inc., the Delaware corporation."

30.     Contrary to the Affidavits filed in opposition to this Motion, Ms. Misra at Paragraph 7, claims that she worked out of Xechem's New Brunswick, NJ and Gaithersburg, Maryland offices.

31.     She does not claim that she worked at the "Frederick, MD office."

32.     At Paragraph 23 of her complaint, Dr. Misra judicially admits that on Augsut 16, 2007, that she had "discovered that the desk and several shelves in her New Brunswick, NJ office had been cleared out, including the removal of numerous books and personal items owned by Dr. Misra, and valued at approximately $1,500.00."

33.     At Paragraph 27 of her complaint, she states that she "has been since 1994 a full employee of 'Xechem'" [referring to Xechem International, Inc.]. That statement is not true.

Her Form W-2's attached to Dr. Pandey's Affidavit indicate that she was employed by Xechem, Inc., an Illinois corporation, and not Xechem International, a Delaware corporation.

34.     At Exhibit F, attached to the Complaint, is the filing for Xechem International, Inc. with the Securities and Exchange Commission and not for Xechem, Inc.

35.     Counsel for Ms. Misra has attached to her Affidavit a transcript of the hearing of Monday, June 23, 2008, in *Bhuwan Pandey v. Xechem International, Inc.* in the US District Court for the District of New Jersey, Civil No. 07-5123.

36.     In that transcript of proceedings and in the Affidavit of Leslie Moylan, to which this contrary Affidavit is made, in that case, the Judge granted Xechem International's motion to vacate the default previously entered (page 9, line 21 of the transcript), granted to the defendant

leave to file an answer and affirmed that the prior motion by the other individual defendants, who were purportedly served at the same time by the process server, that the court had previously granted their motions to dismiss for want of jurisdiction and lack of service.

37.    The court noted that the Plaintiff had gotten 30 days to re-serve the individual directors and had failed to do so. The court viewed those motions as being moot, the individuals having been dismissed. *See* page 10, lines 2 – 14 of the transcript.

38.    It is worthy of note that the Appendix A to the Affidavit the process server Swickle, that the Xerox copy shows that at the time of the service that Leonard Mudry refused to state his relationship or title, and apparently somebody in a different handwriting wrote in "Vice President of Finance."

I Steve Burg, under penalties of perjury as provided by law, certify that the statements set forth above are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid, that I verily believe the same to be true.

August _7_, 2008

Stephen Burg

1091768_1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

RENUKA MISRA,

    Plaintiff,

       vs.

XECHEM INTERNATIONAL INC.,

    Defendant.

Civil Action No. 08-CV-03231

Honorable James B. Moran

**ATTACHMENTS TO AFFIDAVIT OF STEPHEN BURG**

1. Order of June 23, 2008, in case entitled *Bhuwan Pandey v. Xechem International*, Order quashing service of process and dismissing Plaintiff's Complaint as to the defendants Swift, Burg, Adelaji and Biggs. *Bhuwan Pandey v. Xechem International Corp., et al.*, U.S. District Court New Jersey Civil Action No. Docket 2-07-CV-05123-PGS-ES

2. Order of June 23, 2008, in same proceeding as above, denying Plaintiff's application for default judgment and granting defendant's alternative motion.

3. Internet printout from the Secretary of State of the State of Delaware, Certificate of the Division of Corporations, State of Delaware, Online Services Official Website for Xechem International, Inc., showing the registered agent as being National Registered Agents, Inc. at 160 Greentree Drive, Suite 101, Dover, Delaware.

4. A detailed report delivered by Jesse White, Secretary of State of the State of Illinois for the entity known as Xechem, Inc., with its registered agent being Mitchell Goldsmith, 111 E. Wacker Drive, Suite 2800, Chicago, Illinois 60601.

5. Aerial survey photograph of 1405 Key Parkway, Frederick, Maryland, identifying Hunter Glen Apartments under the letter "A" as being the apartment referred to as being occupied by Ms. Renuka Misra, and now claimed to be the office of Xechem International. Included therein is the internet advertisement for Hunter Glen Apartments, a rental community, describing the rentals and services offered for the tenants.

6. WhitePages.com photograph with detail for the residence of Renuka Misra at 12106 Pawnee Dr., Gaithersburg, MD, indicating the house on Pawnee Drive referenced in the affidavit filed in opposition to Xechem's Motion to Vacate Default Judgment. Said photograph was secured from the WhitePages.com internet site.

7. Excerpts from transcript of deposition of Ramesh C. Pandey, taken on May 12, 2005, in the cause then pending in the U.S. District Court for the Northern District of Illinois entitled *Xechem Inc., an Illinois corporation, and Xechem*

*International, Inc., a Delaware corporation*, *v. Bristol-Myers Squibb & Co.*, 03 C 1920, including page 1 and minuscript pages 2, 3, 4 and 7.

Lois H. Goodman, Esq.
McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4079
(973) 622-7711
Attorneys for Defendants, Robert Swift, Stephen F. Burg, Adesoji Adelaja and Martin Biggs

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BHUWAN PANDEY,<br><br>       Plaintiff,<br><br>      v.<br><br>XECHEM INTERNATIONAL CORPORATION; ROBERT SWIFT; STEPHEN F. BURG; ADESOJI ADELAJA; MARTIN BIGGS, RAMESH PANDEY; JOHN AND JANE DOES 1-25; and ABC CORPORATIONS 1-25,<br><br>      Defendants. | **Civil Action No. 07 cv 5123(PGS)**<br><br><br><br><br>**ORDER QUASHING SERVICE OF PROCESS AND DISMISSING PLAINTIFF'S COMPLAINT PURSUANT TO FED.R.CIV.P. 12(B)(5) AS TO DEFENDANTS, ROBERT SWIFT, STEPHEN F. BURG, ADESOJI ADELAJA, AND MARTIN BIGGS**<br><br>**(Returnable January 28, 2008)** |

This matter having been opened to the Court by way of motion filed by Defendants, Robert Swift, Stephen F. Burg, Adesoji Adelaja and Martin Biggs by their attorneys, McElroy, Deutsch, Mulvaney & Carpenter, LLP seeking the entry of an Order quashing service of process and dismissing Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(5); and the Court having considered the papers submitted and oral argument, if any; and for good cause shown;

IT IS on this _____3_____ day of _April_, 2008,

**ORDERED, ADJUDGED AND DECREED** that Service as to Defendants, Robert Swift, Stephen F. Burg, Adesoji Adelaja and Martin Biggs shall be, and it hereby is, quashed; and it is further

ORDERED, ADJUDGED AND DECREED that Plaintiff, Bhuwan Pandey's ~~without prejudice~~

~~Complaint is hereby dismissed as to Defendants, Robert Swift, Stephen F. Burg, Adesoji Adelaja~~

~~and Martin Biggs.~~

It is further Ordered that plaintiff must re-serve within 30 days; and if not served within 30 days, the Complaint is dismissed without prejudice

Honorable Peter G. Sheridan, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| BHUWAN PANDEY, | : | |
| | : | Civil Action No. 07-5123 (PGS) |
| | : | |
| Plaintiff, | : | |
| v. | : | ORDER |
| | : | |
| XECHEM INTERNATIONAL CORP, | : | |
| et al. | : | |
| Defendants. | : | |

This matter comes before the Court on Plaintiff's motion for default judgment and Defendant Xechem's cross motion to quash service and dismiss or vacate default. The Court has considered the parties' submissions. For the reasons set forth in the record, and for good cause having been shown,

IT IS, on this 23rd day of June, 2008,

ORDERED that Defendant's motion to quash service or to dismiss is denied; it is further

ORDERED that Defendant's motion to vacate the entry of default is granted; it is further

ORDERED that Defendant is granted 30 days from the date of this order to answer or otherwise plead; it is further

ORDERED that Plaintiff's motion for default judgment is denied.

Peter G. Sheridan, U.S.D.J.

June 23, 2008



| Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local Sites |

State Directory | Help | Search Delaware: [          ] GO          Citizen Services | Business Services | Visitor Info.

**Department of State: Division of Corporations**

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
General Information
Status
Validate Certificate

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
UCC Searches
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request

**Frequently Asked Questions**   **View Search Results**

## Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| File Number: | 2377360 | Incorporation Date / Formation Date: | 02/10/1994 (mm/dd/yyyy) |
|---|---|---|---|
| Entity Name: | XECHEM INTERNATIONAL, INC. | | |
| Entity Kind: | CORPORATION | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |

**REGISTERED AGENT INFORMATION**

| Name: | NATIONAL REGISTERED AGENTS, INC. | | |
|---|---|---|---|
| Address: | 160 GREENTREE DRIVE SUITE 101 | | |
| City: | DOVER | County: | KENT |
| State: | DE | Postal Code: | 19904 |
| Phone: | (302)674-4089 | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status  ○ Status,Tax & History Information   [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

site map | about this site | contact us | translate | delaware.gov



# CORPORATION FILE DETAIL REPORT

| Entity Name | XECHEM, INC. | File Number | 55869421 |
|---|---|---|---|
| Status | GOODSTANDING | | |
| Entity Type | CORPORATION | Type of Corp | DOMESTIC BCA |
| Incorporation Date (Domestic) | 03/08/1990 | State | ILLINOIS |
| Agent Name | MITCHELL GOLDSMITH REGISTERED | Agent Change Date | 06/25/2008 |
| Agent Street Address | 111 EAST WACKER DRIVE STE 2800 | President Name & Address | ROBERT SWIFT 379 THORNALL ST EDISON NJ 08837 |
| Agent City | CHICAGO | Secretary Name & Address | SAME |
| Agent Zip | 60601 | Duration Date | PERPETUAL |
| Annual Report Filing Date | 03/26/2008 | For Year | 2008 |
| Old Corp Name | 06/08/1990 - RAMESH PANDEY, INC. | | |

**Return to the Search Screen**

**Purchase Certificate of Good Standing**

**(One Certificate per Transaction)**

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

## Map of 1405 Key Pky, Frederick, MD 21702-9028 



When using any driving directions or map, it's a good idea to do a reality check and make sure the road still exists, watch out for construction, and follow all traffic safety precautions. This is only to be used as an aid in planning.

 Address **1405 Key Pkwy**
**Frederick, MD 21702**









**Apartment Features**

- Water, Sewer, Trash Included in Rent
- Individually Controlled Air Conditioning and Gas Heat
- W/D in Unit
- Fully Equipped Kitchen with Dishwasher, Garbage Disposal
- Walk-In Closets
- Luxurious Wall-to-Wall Carpeting

- Cable Hookups
- Ceiling Fans
- Private Patios Available
- Off-Street Parking
- Controlled Access Entrances

**Community Features**

- 24-Hour Emergency Maintenance
- Short Term Lease Available
- Pets Welcome
- Resort-Style Pool
- Outdoor Play Center

- Resident Referral Program
- Preferred Employers Program
- Community Social Activities
- Online Payment Options

Welcome to Hunters Glen Community and discover the comfortable lifestyle of easy living. The community is located just minutes to I-70 or I-270 corridor, with luscious and well manicured landscape. We are located just minutes from Frederick Memorial, 10 minutes from downtown and walking distance to the city commuter service. If you are interested in history, arts, shopping, or fine dining, then Hunters Glen is the place you should call home.

Enjoy our spacious living areas with fully equipped kitchen, washer and dryer in each apartment home, and ceiling fan to assist with energy conservation. Our community has one, two and three-bedroom apartments. Many homes have been given a makeover with beautiful oak cabinets, modern appliances and lighting, easy to maintain flooring, and plush carpeting.

Hunters Glen exceeds our residents' need for comfort by offering planned social activities, an outdoor play

center, and a sparkling swimming pool.  You will also enjoy the privacy of controlled access system to each apartment home.

This apartment community is professionally managed by The Apartment Gallery who provides outstanding service and easy living.  We provide you with on-site management and maintenance teams who are committed to providing outstanding customer service and 24- hour emergency maintenance. Our dedicated team offers fax and package service, online maintenance requests, automatic bank withdrawal service, and online rental payments.  Before starting your day stop by for a complimentary cup of coffee.

At Hunters Glen we make people matter, call us today at (301) 695-5133 for your private tour.

---

©2008 The Apartment Gallery
1 Waterford Professional Center | York, Pennsylvania | United States | 17402
Site Designed By:
MGM Enterprises Inc.



Fair Housing and Equal Opportunity



I need a degree in:

**Accounting**        **Criminal Justice**        **Health**

**Business**          **Education**               **Technology**



## Listing Detail

**Dr Renuka Misra**
12106 Pawnee Dr
Gaithersburg, MD 20878



50 yds

© 2008 Microsoft Corporation    © 2008 NAVTEQ    © 2008 Pictometry International Corp.



Copyright © 1996-2008 WhitePages.com. All rights reserved.
Privacy Policy , Legal Notice and Terms under which this service is provided to you.

Microsoft MapPoint Terms of Use and Privacy Statement.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


| | | |
|---|---|---|
| XECHEM, INC., an Illinois corporation, and XECHEM INTERNATIONAL, INC., a Delaware corporation, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 03 C 1920 |
| BRISTOL-MYERS SQUIBB COMPANY, a Delaware corporation, 345 Park Avenue, New York, NY, 10154, | ) ) ) ) ) | |
| Defendants. | ) | |


        The deposition of RAMESH C. PANDEY, Ph.D.,

called for examination pursuant to the Rules of Civil

Procedure for the United States District Courts pertaining to

the taking of depositions, taken before Ronda L. Jones, a

notary public within and for the County of Cook, State of

Illinois, at One North Wacker Drive, Suite 4200, Chicago,

Illinois, on the 12th and 13th days of May, 2005, at the hour

of 9:00 o'clock a.m.



Reported by:  Ronda L. Jones, CSR, RPR

License No.:  084-002728

Page 2

1  APPEARANCES:
2      SHEFSKY & FROELICH
3      BY: MR. RALPH A. MANTYNBAND and
4          MR. DEAN PETKANAS
5      111 East Wacker Drive, Suite 2800
6      Chicago, Illinois 60601
7      (312) 836-4022
8          Representing the Plaintiffs;
9
10     CRAVATH, SWAINE & MOORE, LLP
11     BY: MR. RICHARD J. STARK and
12         MS. MELISSA MATHIS
13     Worldwide Plaza, 825 Eighth Avenue
14     New York, New York 10019-7475
15     (212) 474-1426
16         Representing the Defendant.
17
18  ALSO PRESENT:  MR. STEVEN R. PETERSON.
19
20
21
22
23
24

Page 3

1              I N D E X
2  WITNESS                      EXAMINATION
3  Ramesh C. Pandey, Ph.D.
4    By Mr. Stark                    6
5    By Mr. Mantynband             367
6
7            E X H I B I T S
8  NUMBER                  MARKED FOR ID
9  Deposition Exhibit
10   Nos. 29 - 39               53
     No. 40                    164
11   No. 41                    165
     No. 42                    177
12   No. 43                    182
     No. 44                    184
13   No. 45                    189
     No. 46                    191
14   No. 47                    193
     No. 48                    197
15   No. 49                    200
     No. 50                    204
16   No. 51                    205
     No. 52                    215
17   No. 53                    217
     No. 54                    221
18   No. 55                    228
     No. 56                    233
19   No. 57                    235
     No. 58                    258
20   No. 59                    273
     No. 60                    275
21   No. 61                    279
     No. 62                    286
22
23
24

Page 4

1      MR. McLEARY:  My name is Jarius McLeary, Legal Video
2  Specialist with McCorkle Court Reporters located at
3  200 North LaSalle Street, Suite 300, Chicago, Illinois,
4  60601.
5          I'm the camera operator on May 12th, 2005, for
6  the videotaping of the deposition of Ramesh Pandey being
7  taken at One North Wacker Drive, Suite 4200, at the time of
8  9:15 a.m. in the matter of Xechem, Inc., et al., plaintiff,
9  versus Bristol-Myers Squibb Company, defendant, filed in the
10  United States District Court for the Northern District of
11  Illinois, Case No. 03 C 1920.
12          Will counsel please identify themselves for
13  the record beginning with the plaintiff's counsel?
14      MR. MANTYNBAND:  Ralph Mantynband for the plaintiff.
15      MR. STARK:  Richard Stark, Cravath, Swaine & Moore, LLP,
16  for Bristol-Myers Squibb Company, and with me today is
17  Melissa Mathis.
18      MR. McLEARY:  Will the court reporter please identify
19  herself and swear in the witness?
20      THE REPORTER:  My name is Ronda Jones with
21  McCorkle Court Reporters.
22          Sir, will you raise your right hand, please?
23          (Witness sworn.)
24

Page 5

1          RAMESH C. PANDEY, Ph.D.,
2  called as a witness herein, having been first duly sworn, was
3  examined and testified as follows:
4              EXAMINATION
5  BY MR. STARK:
6      Q.  Good morning, Dr. Pandey.
7      A.  Good morning.
8      Q.  How are you today?
9      A.  Fine.  Thank you.
10     Q.  Thanks for coming today.  We have a lot of --
11     MR. MANTYNBAND:  Wait.
12     MR. STARK:  -- material to get through.
13     MR. MANTYNBAND:  Let's identify the person present for
14  the record.
15     MR. STARK:  Do you --
16     MR. PETERSON:  Also present is Steven Peterson with
17  Lexecon for Bristol-Myers.
18     MR. STARK:  And also present a paralegal from our office
19  Meredith Duffy.
20     MR. MANTYNBAND:  Lexecon?
21     MR. PETERSON:  Yes.
22     MR. MANTYNBAND:  Meredith Duffy, she's a paralegal?
23     MR. STARK:  Right.
24     MR. MANTYNBAND:  Okay.

Page 6

1    MR. STARK:  You want to identify who else is present on
2    your side?
3    MR. MANTYNBAND:  Dean Petkanas.  Mr. Peters, are you an
4    attorney?
5    MR. PETERSON:  Peterson.
6    MR. MANTYNBAND:  Peterson.  I'm sorry.
7    MR. PETERSON:  No, I'm not.
8    MR. MANTYNBAND:  In what capacity are you here?
9    MR. PETERSON:  I'm a consultant to Bristol-Myers.
10   MR. MANTYNBAND:  Are you an employee of Bristol-Myers?
11   MR. PETERSON:  No, I'm not.
12   MR. MANTYNBAND:  Are you an opinion witness or potential
13   opinion witness?
14   MR. STARK:  Mr. Peterson is an economic consultant
15   employed by us.
16   MR. MANTYNBAND:  Is he going to be designated as an
17   opinion witness?
18   MR. STARK:  No.
19   MR. MANTYNBAND:  He will not be designated as an opinion
20   witness?
21   MR. STARK:  No.
22   MR. MANTYNBAND:  I object to your presence here,
23   Mr. Peterson.  I know nothing about you actually other than
24   you've been identified, but we are operating under a

Page 7

1    protective order, and I have no idea what the examination
2    will consist of today, but I certainly don't want to waive
3    any of our rights under the protective order which
4    Bristol-Myer secured here.  So I object to your continued
5    presence in the room when any of the matters which may be
6    covered by the protective order will be examined on.
7    MR. STARK:  Well, your objection is noted on the record.
8    I will state for the record there's absolutely no basis for
9    your objection as to the protective order which you drafted
10   permits us --
11   MR. MANTYNBAND:  No, oh no.
12   MR. STARK:  Don't interrupt me, please.  Do not
13   interrupt.
14   MR. MANTYNBAND:  I wouldn't think of interrupting you.
15   MR. STARK:  Protective order which you drafted and the
16   Court adopted and entered allows us to employ consultants,
17   and they are allowed to see and receive confidential
18   information, and that's the end of the story here.
19   MR. MANTYNBAND:  Have you signed anything, any
20   document --
21   MR. STARK:  He has signed the appropriate documents.
22   MR. MANTYNBAND:  -- about confidentiality?
23   MR. STARK:  He's not the witness.  You may speak to me,
24   Mr. Mantynband.  He has signed the appropriate documents.

Page 8

1    MR. MANTYNBAND:  Let me get a few other housekeeping
2    things out of the way.
3    Somebody from your side, I think probably
4    Melissa, designated the three players on the protective
5    order, and the three you've asked for are fine with us.
6    MR. STARK:  Thanks.
7    MR. MANTYNBAND:  At the same time I'm designating
8    Ramesh Pandey, the witness, and Dean and one player to be
9    chosen later to be the third.  I don't know what else I had
10   here.
11   MR. STARK:  We'll have to get back to you on those
12   designations.  I'll have to run that by the client.  I didn't
13   ask you to give me an instant response with that.  Taking it
14   under advis --
15   MR. MANTYNBAND:  I told you --
16   MR. STARK:  Please don't interrupt me, Mr. Mantynband.
17   I'll be happy to get back to you.  I don't know whether
18   there's any issue.  I hope there won't be any issue.  But I
19   have an obligation to consult with my client about that just
20   as I'm sure you did.  Any other housekeeping matters?
21   MR. MANTYNBAND:  Go.
22   MR. STARK:  Thank you.
23   BY MR. STARK:
24   Q.  Morning again, Dr. Pandey.

Page 9

1    A.  Good morning.
2    Q.  Let me, let me ask you, first of all, to state your
3    full name and address for the record.
4    A.  My full name is Ramesh C. Pandey.  I live at
5    30 South Adelaide Avenue in Highland Park, New Jersey.
6    Q.  And you work at Xechem International.  Is that
7    correct?
8    A.  Yes.
9    Q.  In New Brunswick, New Jersey?
10   A.  New Brunswick, New Jersey.
11   Q.  I'd just like to ask you a little bit about your
12   personal background.
13   Could you describe for me briefly, if you
14   would, your education post -- after the high school level?
15   A.  I have a Bachelor's Degree in physics, chemistry,
16   mathematics and a Master's Degree in chemistry with the
17   specialization in organic chemistry and a Ph.D. in medicinal
18   chemistry.
19   Q.  And where did you get those degrees?
20   A.  I got my BS from University of Allahabad and
21   Master's from Gorakhpur University and Ph.D. from
22   National Chemical Laboratory University of Pune in India.
23   Q.  All three of those were institutions in India?
24   A.  Yes.

Page 10

1    Q.  Would you mind spelling the names of those for the
2  benefit of the reporter?
3    A.  Names of the universities?
4    Q.  Of the schools, yeah.
5    A.  First BS was from University of Allahabad,
6  A-l-l-a-h-a-b-a-d, and the second university was
7  University of Gorakhpur, G-o-r-a-k-h-p-u-r.  My Ph.D. was
8  from National Chemical Laboratory University of Pune,
9  P-u-n-e.
10   Q.  Thank you.  When did you come to United States?
11   A.  I came to United States in 1966, '67.
12   MR. McLEARY:  Excuse me, Mr. Pandey.  Would you raise
13 your mike up just a little bit?
14   MR. STARK:  Dr. Pandey -- it looks like the microphone
15 might be on the back of his tie.  If you could put it on the
16 other side of your tie.  Now it's facing down.  I think
17 that's better.  Thanks.
18   THE WITNESS:  Thank you.
19 BY MR. STARK:
20   Q.  When did you receive your Ph.D.?
21   A.  In 1965.
22   Q.  Could you briefly summarize for me your employment
23 history beginning when you came to the U.S. up until the
24 present?

Page 11

1    A.  When I came to U.S.?
2    Q.  Yeah.
3    A.  I came to U.S. in, as a research associate to
4  University of Illinois at Urbana Champaign.  As I said my
5  Ph.D. was in medicinal.  I expanded my background into
6  antibiotics.  So I worked at University of Illinois for,
7  since, until 1970.
8         And then I moved back to India.  From '70 to
9  '72 I was in India.
10        Then I came back to University of Illinois in
11 '72, and I was at University of Illinois from '72 to '77 as a
12 visiting scientist.
13        And then '77 I joined Frederick Cancer
14 Research Facility, National Cancer institute.
15   Q.  I'm --
16   A.  And I was there until '83.  Then '83 I joined
17 Abbott Pharmaceutical.  I was there for nine months.  And
18 then I joined -- as a joint venture we formed Xechem and
19 joined LyphoMed.
20   Q.  That was in '83?
21   A.  That is 83, yes, '83, '84.
22        And then in 1990 when Fujisawa bought Fuji --
23 LyphoMed we bought Xechem out of Fujisawa/LyphoMed, and
24 Xechem became an independent company.  And we moved to

Page 12

1  New Brunswick, New Jersey, in 1991, and since then I have
2  been with Xechem.
3    Q.  You testified a moment ago that in 1977 to 1983 you
4  were with --
5    A.  National Cancer Institute.
6    Q.  National Cancer Institute.  I think I may have
7  missed something in there.  Were you with some particular
8  clinic or --
9    A.  With the Frederick Cancer Research Facility.
10   Q.  Frederick?
11   A.  Frederick Maryland, yes.
12   Q.  What was the nature of the work that you did while
13 you were at the NCI?
14   A.  I was working on anticancer drugs.  They had a
15 problem which they were struggling for few years, and I was
16 instrumental in solving that problem.
17   Q.  What was the problem?
18   A.  There was a drug that had isolated which was
19 showing both antitumor and antitumor activity, anticancer
20 activity; and in that group of compound that was very
21 unusual.  And since I had expertise in that group of
22 antifungal compounds, so I joined as a senior scientist
23 there.
24        And then what I found was the antitumor or

Page 13

1  anticancer activity was because of trace impurities of some
2  other product; and when the compound was purified, there was
3  no antitumor activity.
4    Q.  What was the compound you were working with?
5    A.  I work on couple compounds there.  This compound,
6  later on it turn out to be a known compound like filipin.
7  This is a polyene antibiotic group of compounds, bentyne
8  group of compounds, and impurity was Actinomycin-d.
9    Q.  Can you spell the terms?  The name of the drug or
10 the compound that you were working on was filipin?  Is
11 that --
12   A.  This was filipin, f-i-l-i-p-i-n.
13   Q.  Okay.
14   A.  And the impurity was Actinomycin-D,
15 A-c-t-i-n-o-m-y-c-i-n - D.  Actinomycin-D is an antitumor
16 compound, and filipin is a polyene group of antibiotics.  It
17 falls into bentyne.  That was part of my work.
18        And then we work on fredericamycin,
19 magnamycin, doxorubicin, daunomycin.  So that was my job.
20   Q.  During the time that you were at MCI did you work
21 on paclitaxel at all?
22   A.  No.
23   Q.  You mentioned that during 1970 to 72 you returned
24 to India.

Page 22

1  found the BMS application to be stronger than the Xechem
2  application?
3      A.  Probably yes.
4      Q.  You think there was any other reason why the NCI
5  chose BMS rather than Xechem?
6      A.  I don't know.
7          There's a book called "The Story of Taxol"
8  written by two British authors.  I think -- I would suggest
9  if you haven't seen that maybe you should look into that
10 and --
11     Q.  I have a copy.
12     A.  Okay.
13     Q.  Now, you have been since about 1990 the chief
14 executive of Xechem International, right?
15     A.  Right.
16     Q.  Amongst your group of companies
17 Xechem International is at the top of the pyramid, right?
18     A.  Yes.
19     Q.  So then there's Xechem, Inc., and that's a
20 wholly-owned subsidiary of Xechem International.  Is that
21 right?
22     A.  You are right.
23     Q.  Xechem International is located in New Brunswick,
24 New Jersey, right?

Page 23

1      A.  You are right.
2      Q.  You have some office space there, correct?
3      A.  Yes.
4      Q.  Do you know about how much space you have in
5  New Brunswick?
6      A.  We have about 30,000 square foot.
7      Q.  Does Xechem, Inc. have any office space separate --
8      A.  Yes.
9      Q.  -- from Xechem International?
10     A.  No.
11     Q.  So Xechem, Inc. physically exists within
12 Xechem International's space?
13     A.  You are right.
14     Q.  Does Xechem International itself have any office
15 space anywhere else besides New Brunswick, New Jersey?
16     A.  No.
17     Q.  You then have or at some point had an entity called
18 Xechem Labs, correct?
19     A.  Yeah.
20     Q.  What was the function of that entity?
21     A.  You see, Xechem International was formed in 1994.
22 Xechem, Inc. existed right from -- since 1990 or '91 until
23 1994.
24         And the charter of Xechem, Inc. was to develop

Page 24

1  materials which are not readily available.  And since we have
2  fully, fully operational, full-fledged laboratory and we are
3  New Jersey state registered, FDA registered -- and we have
4  chemistry, microbiology and all that there -- so we decided
5  to form Xechem Laboratories also.  So Xechem Laboratories,
6  Xechem, Inc. both are there.
7          The operation of Xechem Laboratory is to do
8  services for -- on payment basis -- if somebody needed to
9  test the water or microbill test and all that according to
10 FDA matter or to New Jersey state regulation authorities --
11 according to that.  So we would charge some money.  That was
12 the charter of Xechem Laboratories.
13         Whereas, Xechem, Inc. is a research
14 development manufacturing company.  That's the different
15 between the two.
16     Q.  And Xechem Laboratories is also wholly-owned by
17 Xechem International?
18     A.  Right.
19     Q.  And Xechem Laboratories also share space with --
20     A.  Right.
21     Q.  -- Xechem International?
22     A.  Right.
23     Q.  And doesn't have any space of its own?
24     A.  You are right.

Page 25

1      Q.  And Xechem Laboratories, does that still exist?
2      A.  Yes.
3      Q.  Still functioning today?
4      A.  Yes.
5      Q.  And Xechem India is another entity in the family
6  tree.  Is that also a wholly-owned subsidiary of
7  Xechem International?
8      A.  Yes.
9      Q.  And does Xechem India have any office space?
10     A.  Xechem India is located in New Delhi in India.
11 Yeah, we have an office there.
12     Q.  About how much space do you have there?
13     A.  Maybe couple thousand square foot.
14     Q.  Approximately 2,000 square feet you think?
15     A.  Maybe 2,000 or something like that.
16     Q.  How many people work at Xechem India?
17     A.  Xechem India has -- I don't remember exactly the
18 number.  Maybe around 15 or so.
19     Q.  What's the function of Xechem India?
20     A.  Xechem India function was -- one is to find the raw
21 material.  We thought that a company in India would be in a
22 better position to get the raw material from Indian market
23 rather than an international company dealing with Indian
24 companies.  So that was the purpose of forming Xechem India.